### In re Consolidated Rate Appeals of Green Mountain Power Corporation

[455 A.2d 823]

Nos. 280-81, 311-81, 421-81, 478-81, 82-045

Present: Barney, C.J., Billings, Hill and Underwood, JJ., and Larrow, J. (Ret.), Specially Assigned

Opinion Filed January 5, 1983

374

*Douglas G. Hyde* and *Sheehey, Brue & Gray,* Burlington, and *Mudge, Rose, Guthrie & Alexander,* New York City, New York, for Petitioner-Appellant.

*Michael L. Burak, Robert Steinfeld* and *Jon Anderson,* Montpelier, for Respondent-Appellee.

Barney, C.J. There are five rate orders of the Public Service Board involved in this appeal. Two are final dispositions of requests for rate increases, one is a recoupment order issued in connection with a rate change authorized by one of those final dispositions and two are interim orders issued pending final adjudication of later rate increase requests. By stipulation, the Green Mountain Power Corporation as appellant and cross-appellee, and the Department of Public Service as appellee and cross-appellant agreed to consolidation under V.R.A.P. 3(c).

The utility seeks a broad review of the propriety and effectiveness of rate review procedures as practiced by the Public

Service Board when periods of rapid and substantial inflation are outdating cost figures for power production and purchase almost as soon as they are arrived at. The Department not only undertakes to meet the issues relevant to that situation, but goes on to argue that, in fact, the Board was overgenerous to the corporation in the relief it did grant.

These proceedings commenced with the filing by the utility of an annual rate increase of 21% over test period revenues, to be effective November 10, 1979. The request included a proposed power adjustment tariff applicable only to commercial and industrial users. Test period revenues refer to a selected one year time period in which both operational costs and receipts are taken as an appropriate standard or measuring device against which proposed rate increases can be measured as to return. These test years are subject to adjustment for closer approximation to standard conditions. A power adjustment tariff or clause is a rate setting device designed to authorize rate changes accordingly as the price of purchased power or production may change because of costs affected by such variables as oil price changes, or other costs presumably beyond the control of the utility. Their purpose is to allow a more rapid adjustment to swift changes in costs.

Two months later a second rate increase proposal was filed, seeking 7.9% over test year revenues. The test year was the same as that of the first request, the twelve month period ending June 30, 1979, and a power adjustment tariff for commercial and industrial users was again included. These proposals were suspended by the Board under the authority of 30 V.S.A. § 227.

After extensive hearings in which these two requests were consolidated, the Board allowed a 23.8% increase. This was appealed and became Docket No. 311-81. In connection with that decision the Board made a separate order relating to recoupment authorized to the power corporation and to refunds granted to the public. This order, on appeal, became Docket No. 421-81.

About ten months later the power corporation filed for a third rate increase. This filing sought a 9.47% increase based on a test year ending July 31, 1980. In three months another request, amounting to an additional 3.8% increase over revenues for the same test year, was filed. A power adjustment

tariff for nonresidential customers was originally included, but later withdrawn.

The Board consolidated these requests for hearing and suspended their immediate operation, as before. A temporary rate increase was granted, however, amounting to a minimum allowance very slightly higher than the first of these two requests, but not significantly invading the range of the second request. This temporary order of increase was appealed, becoming Docket No. 280-81.

These two requests then proceeded through public and Board hearings and a final order in these cases was issued. It made permanent the temporary increase, with a slight addition of about $100,000 additional annual revenue. This order was appealed by both the power corporation and the Department, becoming Docket No. 82-045. About two months later the power corporation was granted a recoupment order by the Board based on the permanent rate increase decision.

During this same period, in May, 1981, the power corporation filed a fifth request for a rate increase, using a test year ending December 31, 1980, and amounting to an increase of 18.3% over the revenues of that year. This request, which was suspended by the Board, also included a power adjustment tariff. The Board, in suspending the projected increase, issued an interim order allowing a temporary rate increase amounting to a little less than one-third the requested amount. This decision was likewise appealed, becoming Docket No. 478-81. At the time this appeal was brought the issues of a final rate order and recoupment were still pending.

A moment's reflection will bring to the fore the complexities all these proceedings give to the rate reviewing process and the functioning of the Board. Requests are filed before earlier requests are resolved. Test years are proposed which are themselves subject to projected rate increases not yet final. Each filing represents not only a commitment of time and resources on the part of the Board, but a very substantial investment of funds of the utilities that may represent increased rate increases to consumers without being part of the return to investors or available to improve service. The problem is, indeed, a troubling one, and it is no wonder that some sort of reexamination of procedures is requested.

■ However, the range of relief and change suggested far outdistances the reviewing function assigned by law to this Court, and more properly belongs to policy-determining procedures to be considered internally by the Board or, if necessary, encompassed in legislative action. The judicial duty is to review the specific actions of the Board in the cases before us, testing the rulings for compliance with present statutory standards and insuring that legal limitations, including constitutional concerns, are not overstepped. See *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944).

■ Indeed, it is already stated policy in our law that this Court will not undertake to prescribe the many varieties of approach to rate regulation that the Board must use, but restricts itself to evaluating the Board's order against the appropriate standards provided by the law, including that of adequate evidentiary support. *In re Central Vermont Public Service Corp.*, 141 Vt. 284, 288, 449 A.2d 904, 907 (1982).

■■ The statutory basis of the Board's regulatory authority is extremely broad and unconfining with respect to means and methods available to that body to achieve the stated goal of adequate service at just and reasonable rates. *In re Green Mountain Power Corp.*, 136 Vt. 170, 173, 385 A.2d 1110, 1112 (1978). 30 V.S.A. § 218 authorizes the Board to set rates, tolls, charges or schedules or to change regulations, measurements, practices or acts of the utility relating to its service in order to insure those reasonable rates and adequate service. The choices the Board makes in this area are subject to great deference in this Court so long as it can be shown they are directed at proper regulatory objectives. *In re Green Mountain Power Corp.*, 131 Vt. 284, 303, 305 A.2d 571, 583 (1973).

■ The very breadth of this grant of authority, however, imposes a duty on this Court, in examining the Board's decisions, to require as part of the order that there be full disclosure of the criteria underlying the decision and the methodology employed to evaluate the facts and integrate them into the result. We have already so held. *In re New England Tel. & Tel. Co.*, 135 Vt. 527, 543, 382 A.2d 826, 837 (1977). See also *Washington Gas Light Co.* v. *Public Service Commission*, 450 A.2d 1187, 1194 (D.C. 1982).

Turning from the testing of rate establishment theory to the more prosaic but essential testing of this rate order for constitutional and statutory propriety, we must first look at the specific challenges raised by the utility as defects in the order made. The alleged defects fall under two general headings.

The first is a contention that the manner of establishing a historic test year is so deficient as to deny the utility due process in that reliance on historic data understates current operating expenses, misstates the cost of equity and is compounded as error by the refusal of the Board to hear updated evidence. The second is so closely related that consideration of it is intertwined with the basics of the first contention. Fundamentally, the second point states that the actions of the Board understate operating expenses, do not allow for foreseeable attrition of earnings and thereby reduce the return on equity to the point of being confiscatory.

All of this is again an attack on the methodology of using a historic test year to establish future rates. As we have already noted, it is the responsibility of this Court to examine the validity of the result of its application, leaving the theoretical debate to academic and legislative forums, or to the Board itself. Other applicable standards favor the orders of the Board on appeal before this Court, *Wendland* v. *Green Mountain Power Corp.*, 132 Vt. 320, 322, 318 A.2d 668, 670 (1974), and place the burden of proving such orders "clearly erroneous" under 30 V.S.A. § 11(b) on the appealing party. *In re New England Tel. & Tel. Co.*, 139 Vt. 578, 587, 433 A.2d 263, 268 (1981). The Board has the same function of evaluating the weight of the testimony and the credibility of the witness as other triers of fact. *In re Green Mountain Power Corp., supra,* 131 Vt. at 305, 305 A.2d at 584.

More serious is the charge of the Department of Public Service in opposing the rate increases that the utility's case is irretrievably compromised by evidentiary failure. The lack of evidentiary support for contentions of the utility is several times echoed in the findings of the Board itself. With the burden of supporting change in rates or rate structure squarely on the proponent utility, this shortcoming is serious, indeed. Unless there is a showing, which has not occurred here, that the Board somehow willfully or capriciously ignored or

rejected proper and uncontroverted relevant evidence, the failure of the Board to find the utility's case supported is unimpeachable. Likewise, as we have previously noted, if conflicting evidence was before the Board, it was free to determine for itself what was to be believed and accepted, without intervention by this Court, except on some basis related to bad faith, fraud or demonstrable mistake.

When we examine this first issue, the utility's plea for new and forward-looking rate making methods, the record discloses the evidentiary shortage noted by the Board. Except for the inclusion, in some of the cases, of a request for a power adjustment tariff, referred to in other utility cases as a power adjustment clause, a request we will be examining later in the opinion, nothing by way of rate filing or evidentiary support appears in the record for any such forward-looking rate making procedures. Specifically, there appears to be nothing to support a variation in the usual test year procedures, as a factual matter, which has been forthcoming from the utility's case. No error on the part of the Board can be predicated in that claim.

The second, and most controverted issue, and one which the utility frequently alludes to in its claim of confiscation, relates to rate of return on equity and relation of the book value of Green Mountain Power stock to the cost of capital in the money market. Here there was a great deal of evidence, most of which was in conflict. The utility relied on testimony from its chief officers and an outside expert. The Department of Public Service presented its own outside expert, whom the Board found to be the more credible witness and who gave more detailed testimony relating to the proper percentage to be applied to determine the cost of equity in these rate cases. Although the utility understandably found more validity in its officers' testimony, the Board did not, and no error can be predicated on its choice.

Turning now to the power adjustment tariff, we find that the utility proposed to apply it only to commercial and industrial users in those cases where it was requested at all. The Board was disturbed by this uneven application, as well as by the fact that the utility proposed to base its application

on something called a "three month rolling average." How such a variable could be fitted into the rate-scheduling requirement set out in *In re Allied Power & Light Co.*, 132 Vt. 354, 321 A.2d 7 (1974), was never explained. Moreover, the Board quite rightly was concerned about potential abuse resulting from pricing arrangements worked out among both in- and out-of-state utilities selling power to the system. Bearing these and other significant concerns of fairness to ratepayers in mind, the Board acted within its authority in determining that it would not approve the proposed power adjustment tariff without a showing of much more critical need on the part of the utility than was evidenced. The action of the Board in this particular matter, therefore, withstands challenge.

The utility also takes the Board to task for relying on what it labelled "out of date" expense information when more recent, actual experience was available. This Court has recently addressed the situation involving the improper rejection of relevant evidence. *In re Central Vermont Public Service Corp.*, *supra*, 141 Vt. at 292–93, 449 A.2d at 909. Although, in that case, we found the exclusion of additional data on "actual costs" to be error, our decision was specifically limited in recognition that "some circumstances may justify the exclusion of relevant evidence in Board proceedings." *Id.* at 294, 449 A.2d at 910. The matter before us here demonstrates why this must be so.

The update involved was a request by the utility that, in one of its rate cases before the Board, it be allowed to update its purchased power costs, presumably based on the utility's actual experience. On its face, it would seem required that, where available, actual costs be put in place of estimates in establishing a test year. A moment's reflection will dispel that notion. Test years are time periods selected, during which all appropriate costs and revenues are calculated so as to form a yardstick in the determination of the rate of return to be produced by a given rate schedule. Even at that, in order for the test year to operate fairly in any given application, modifications are necessary. Otherwise, if a period of high cost were picked, the utility's return would be inflated, following rate adjustment, if the costs were nonpersisting. Similarly, the ratepayers would reap a windfall if an unadjusted year were picked

in which the utility's operation costs were, for that brief period, abnormally low.

Because of these concerns, a certain amount of adjusting is done to test years each year they are used as a rate basis, in order to remove abnormalities and anomalies, or to incorporate new unforeseen and persisting expenses or revenues. Thus, "actual cost" adjustments must be carefully scrutinized so that, instead of making the test year more accurate, they do not actually skew it.

The proposal of the utility here was to update one cost factor. To do that alone, without giving attention to whether that cost factor was itself something needing evaluation or adjustment because of transitory or abnormal factors, or without assessing other, related cost or revenue changes concurrent with it, might distort the test year yardstick into an improper measure. In this sense, it is possible for actual data perhaps to be irrelevant. Nevertheless, it is the better practice to get such data into the record and to reject it, if necessary, in connection with the so-called "normalizing" process that goes on with test years.

What the utility sought here was selective updating, a forbidden procedure, since that action will not adjust the test period to reflect typical conditions. See *In re Burlington Electric Light Department*, 135 Vt. 114, 119, 373 A.2d 514, 518 (1977). Moreover, with a new filing, also part of this appeal, the utility sought separately to establish its new rate base, and updating for future rate use was unnecessary. This is, in fact, to be preferred to updating, which may confer a benefit on the utility without correspondingly protecting the ratepayers. In particular, the updating would operate without statutory notice of a further rate change, and would make the rate schedule variable and undependable. The process of substantial rate changes by such a device may also raise due process issues. The Board's rejection of updating in the circumstances before us was within its proper competence.

The utility wraps up in its discussion about use of future projections a similar complaint about the recoupment order. In light of the foregoing analysis of the nature of this Court's review of such proceedings for error, this challenge to the recoupment order cannot prevail.

 The utility faults the Board in its recoupment order, likewise, for failing to make the same recognitions and adjustments there that it sought for permanent rate relief. An examination of the recoupment order reveals that the Board properly applied the formula set out in 30 V.S.A. § 226(b) and fully complied with the statutory directives. That, coupled with our resolution of the issues raised in the rate requests, establishes the validity of the recoupment order.

The Department of Public Service, now an entity independent of the Board, also took issue with parts of the various orders in these cases by way of cross-appeal. Although there are five issues raised, they fall into two logical groups for review, the first relating to capital structure and the second to temporary rates, and they will be dealt with in that fashion.

 The first set of challenges involve the Board's use of a hypothetical equity component in the utility's capital structure for rate setting purposes, referred to as "proforming," in a case involving rates for one year—a year which had already passed at the time the decision was made. In that same period and the one following it, the Board allowed in the rate base the cost of load management equipment. Both of these allowances were deliberately made by the Board in the belief that the utility would respond by bringing its operation into conformity with the Board's directions. As already noted, 30 V.S.A. § 218 gives the Board broad authority over the acts and practices of the utility relating to its services and allows it to make orders intended to induce the utility to furnish adequate service. Having in mind that it would be, to say the least, counterproductive to issue orders in terms that so threaten the financial health of the utility as to menace its continued operation, since both consumers and investors would be harmed, it is certainly reasonable for the Board to seek changes it feels necessary by means of incentives.

 The Board, in its orders, made its position clear in each of these situations. With respect to proforming the capital structure to 40% from its existing 29.35%, the Board expressed great concern for the fiscal soundness of the utility because it was thereby driven to seek capital by issuance of short term notes. It was the Board's determination, based on expert testimony, that the utility ought to have a larger part

of its capital resting on investment from stockholders, even at the expense of diluting present ownership equity by enlarging the amount of stock outstanding. 30 V.S.A. § 108 lets a utility borrow in such fashion so long as such debt does not exceed 20% of the utility's total assets. The evidence showed that this utility had passed that statutory limit and, therefore, was committed to a high interest expense and was handicapped in obtaining long-term financing. This situation menaced both the stockholders' investment and the consumers' electricity costs. The need for action by the Board was demonstrated and the procedure was within its statutory obligation to both investor and ratepayer. The order is upheld in this particular.

It should be noted that, in this instance, the utility did not respond to the effort of the Board to persuade it to strengthen its capital structure. The Board then, in the following rate case, withdrew the benefit of the assumed capital structure and, in a later order, mandated that the utility actually complete appropriate long-term funding within one year.

In the case of the load management equipment, the Board, in drafting its order, drew on its experiences in allowing another utility to put such equipment in its rate base prior to installation. When that company failed to make the installation, the item was subsequently removed from its rate base. In this case, the Board stated that such equipment is vital to a utility in order to prevent waste of energy resources. This possibility is now statutorily recognized in 30 V.S.A. § 202(c), which outlines the planning functions of the Department of Public Service. The equipment pays for itself, in particular, by avoiding the necessity of purchasing extra power or building more generating capacity by making sure that the available electrical energy is as efficiently distributed as possible.

Recognizing that, in the usual case, a utility should not be allowed a return on an investment until that investment is actually made, nevertheless the Board felt this equipment so vital to the interests of consumers and ratepayers that it made a conscious decision to give an incentive to the utility to carry through this installation by inclusion in the rate base. But the Board did not stop there. In its order it set up a timetable for installation of the equipment, with monthly updates on progress. More important, it ordered that in the event the utility

did not substantially comply with the order, the Board would not only entertain a motion by the Department to remove the load management equipment from the rate base, but would further require a refund of all rates paid by customers based on the presence of this projected cost in the rate base. It seems clear that here, too, the Board has carried out its statutory function in most supportable fashion, with an adequate eye to the protection of both investors and ratepayers. Its statutory authority has not been exceeded.

The Department complains, as did the utility in the direct appeal, about the departure from actual data in the rate allowances which it appeals. The considerations the Department advanced in opposition to the utility's position in the appeal, in addition to the reasons already given, are also of force here.

The second issue that the Department raises in its cross-appeal is the authorization by the Board of two temporary rate orders. Its position rests primarily on its interpretation of 30 V.S.A. § 226(a). The statute begins by outlining the procedures that may be invoked after a new rate filing by a utility in order to test it for reasonableness and justness. The section then goes on to say:

> Thereupon, if the board in its discretion so orders, such change shall not go into effect until the final determination of the proceedings so instituted, provided, however, that if it shall be made to appear to the satisfaction of the board, that the public interest requires a change in rates, charges or services, or that such change is necessary for the purpose of providing adequate and efficient service or for the preservation of the property of the public service company devoted to public use, the board, after preliminary hearing, may authorize upon such terms, conditions or safeguards as it deems proper an immediate reasonable temporary increase in such price pending the final determination of the price to be thereafter charged by any such public service company . . . .

30 V.S.A. § 226(a) (1970) (section amended generally in 1981 and again in 1982). Under 30 V.S.A. § 2(b), the director for public advocacy shall represent the interests of the people of the state. The statute then goes on to provide for the furnish-

ing of a bond by the utility for the refunding to the ratepayers of any excess over the rates finally ordered.

The Department centers its attention on the following two phrases in § 226(a): "the public interest requires a change in rates," and, alternatively, "that such change is necessary for the purpose of providing adequate and efficient service or for the preservation of the property of the [utility]." It is the position of the Department that this language indicates a legislative purpose requiring compelling and necessitous circumstances to justify the awarding of temporary rate relief. From this the Department advances the contention that the Board is not authorized to award temporary rates where it merely serves the public interest. This rather remarkable disclaimer, from one designated as the representative of the people (30 V.S.A. § 2(b)), we take to be an assertion in fact that the allowance of temporary rates cannot be in the public interest unless the situation of the utility is truly desperate.

This view must first confront the undoubted fact that the language of the statute does not plainly state or compel that interpretation. Indeed, the intendments of the entire regulatory enactment all point to a less restrictive view of the Board's power in this particular.

At the time these proceedings commenced, the Board's functions were, in part, described as follows in 30 V.S.A. § 202(b) (1970):

> The board's duties shall include surveys to determine needed and desirable plant improvements and extensions, interconnections and coordination between utility systems, joint construction of facilities by two or more utilities, methods and facilities of operation, and any change that will produce better service or reduced costs. To this end the board shall require the submission of data by each company subject to its supervision, of its anticipated growth and its plans to meet that growth, and such other information as the board deems desirable.

In the division of the old organization into a separate board and department, by No. 204 of the Acts of 1979 (Adj. Sess.), effective February 1, 1981, the planning function, among others, was made the responsibility of the Department. Nothing in that separation made it any less the concern of the Board

in its regulatory role to review actively the operation of companies under its jurisdiction, in order to insure proper service at minimum cost. *In re Green Mountain Power Corp., supra,* 131 Vt. at 308, 305 A.2d at 585. The statement in that case is very pertinent here:

> Indeed, as have been evidenced by this very appeal, the conditions giving rise to Green Mountain's request for a rate increase are complex and involve long range decisions which the Board has a continuing duty to survey and inform the public of. It is only through the wise and responsible exercise of the Board's duties in this area can the interests of the consumer be effectively balanced against those of the utilities on a long term basis.

Furthermore, the internal logic of 30 V.S.A. § 226, especially taken in connection with the overall regulatory purposes put in place by the legislature, is inconsistent with a narrow construction of the temporary rate increase authority given to the Board. Discretionary power is separately placed in the Board to permit or refuse to permit filed rates to take effect immediately, even though subject to further investigation and hearing. Nothing by way of special standards of need or financially critical circumstances relating to the utility is required to be demonstrated, in order to justify the exercise of this discretion, other than the overriding constant that the decision be subject to the "just and reasonable" test.

Since, on the other hand, the company has a right to put its proposed rates in place under bond if the Board fails to make its determination within six months, 30 V.S.A. § 227(a), the compelling inference is that the temporary rate provision is intended by the legislature to permit the Board to deal with a pressing situation that does not justify allowing the proposed rates to take effect, but justifies some affirmative action before final disposition can assuredly be had and in advance of the bonding provision of 30 V.S.A. § 227(a). Thus, temporary rates, if available, can take into account the dimensions of a rate request that represents justifiable needs, without compelling the Board either to allow for the interim the whole request or, on the other hand, to deny it altogether. Taking this to be the rational view of the legislative purpose of the option

to allow temporary rates, the Court is not disposed to impart restrictions and standards so constraining that the purpose of the enactment is destroyed.

■■■ The Department further faults the Board for the content and completeness of its findings in support of the temporary order. At this point it is necessary to point out other considerations that govern our testing of the sufficiency of the Board's actions with respect to temporary rates, beyond those already set out. The essence of temporary rates is that they be promptly put in place, subject only to a basic concern for reasonableness. The statutory adjective is "immediate." 30 V.S.A. § 226(a). This, by itself, indicates that the temporary rate hearing, further described in the statute as "preliminary," is not by any means intended to require a full and detailed explanation of the supporting and opposing issues related to the usual rate increase. The order for hearing may come within six days of the effective date of the proposed rate; indeed, the difference between "immediate" and the six months' limitation with respect to temporary, as contrasted to final, rates itself suggests an immense difference in scale of investigation and presentation between the two. The standards of review by this Court must be consistent with this statutory pattern.

It should be remembered that temporary rates come with built-in limits. The rate request itself and its supporting documentation set an upper limit. The range of time whereby such rates apply is delineated by the time the Board takes to reach final decision. Also, the setting of final rates gives the Board a chance to make corrective adjustments so that injustice and inequity do not occur. The temporary rates may be put under bond and overcharges are to be refunded.

■■ Accompanying all of this protection is authority vested in the Board to "authorize [these temporary rates] upon such terms, conditions or safeguards as it deems proper." 30 V.S.A. § 226(a). Hedged in by all this protection, the utility, the ratepayers and the interested public can complain of a breach of their interests only upon some egregiously unreasonable and unfair action on temporary rates. Nothing of the kind has been brought to our attention in this case, and it certainly will not be presumed.

■ There is also a complaint by the Department that the failure to prefile testimony relevant to the temporary rate order was a violation of due process. 3 V.S.A. § 810 allows the filing of written evidence, but nowhere does it require that it be prefiled in advance of hearing as a component of due process with respect to temporary orders. Significantly, we are cited to no case that has so held. The cited material is directed to issues raised in connection with final dispositions, not temporary rates. There is no question but that, at hearing, the Department had an opportunity to challenge the matter raised at that time, and apparently did so. The hearing relating to temporary rates was set by the Board, and equivalent notice was available to both sides. Given the nature of the proceedings as already defined and the purposes to be served, we find no due process deficiency.

*The orders of the Public Service Board appealed in Docket Nos. 280-81, 311-81, 421-81, 478-81 and 82-045 are affirmed.*