# In re Petition of Green Mountain Power Corporation

[519 A.2d 595]

No. 84-516

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed August 14, 1986

Motion to Reargue Filed by Amicus Curiae Denied December 9, 1986

*Michael G. Furlong* of *Sheehey, Brue & Gray*, Burlington, and *Christopher L. Dutton* and *Jonathan H. Winer*, Green Mountain Power Corp., South Burlington, for Plaintiff-Appellee.

*Thomas J. Kennedy*, St. Albans, for Defendant-Appellant Vermont Public Interest Research Group.

*Michael Marks* and *Gerald R. Tarrant*, Directors for Public Advocacy, and *Jon T. Anderson*, Special Counsel, Montpelier, for Defendant-Appellant Public Service Department.

**Peck, J.** This is an appeal by the Department of Public Service and the Vermont Public Interest Research Group (VPIRG) from a Public Service Board order granting the petitioner's request for an increase in rates, and is also an appeal from the Board's interlocutory orders denying certain requests for discovery by VPIRG. We affirm in each instance.

Green Mountain Power Corporation (GMP) filed a notice of change in rates on January 5, 1984, pursuant to 30 V.S.A. § 225. The Department appeared as a statutory party,[1] and VPIRG was granted intervenor status. GMP asserted as the basis for its request increased capital investment and operating expenses. The test year involved was the period September 1, 1982 through August 31, 1983. The principal substantive issue was the treatment to be accorded to costs incurred by the petitioner during an unscheduled shutdown of the Vermont Yankee nuclear plant during 1983.

In March, 1983, Vermont Yankee shut down for a scheduled eight-week refueling outage. The plant refuels on a 12- to 14-month cycle, and its regular shutdowns for this purpose are included in the determination of the company's operating costs and its retail rates. During the scheduled 1983 shutdown, Vermont Yankee personnel discovered cracking in welded joints of Vermont Yankee's recirculation pipes—what is known in the industry as an Intergranular Stress Corrosion Cracking (IGSCC). In order to correct the problem Vermont Yankee scheduled a full-pipe replacement during a 32-week refueling shutdown scheduled to occur from September, 1985 through April, 1986. But the immediate problem of the cracking in the recirculation piping system had to be dealt with on an interim basis, and Vermont Yankee sought and received approval from the Nuclear Regulatory Commission to repair the system by weld overlayment of the sections of piping in question. This interim repair consumed about seven weeks of unscheduled outages immediately after the scheduled 1983 refueling outage, and it is the costs related to this unscheduled outage that are at issue here.

---

[1] 30 V.S.A. § 2(b).

VPIRG and the Department urged the Board not to permit the deferral and amortization of replacement power costs for the seven-week 1983 outage, first, because such treatment would constitute retroactive ratemaking, and second, because the two-shutdown strategy for repairing the IGSCC was imprudent. The Board was urged to hold GMP, as a shareholder in Vermont Yankee, accountable for this imprudence.

VPIRG sought discovery of information it asserted was available to GMP or to Vermont Yankee and relevant to the issue of the repair strategy. The Board denied its discovery requests, conceding the technical relevance of the information but concluding "that the issues to which they relate are too speculative and, in ratemaking statutes, too complex to be dealt with in this proceeding." The Board stated it would deal with these issues in a separate proceeding in which all stockholders of Vermont Yankee could participate as parties, adding that GMP might not be in a position to obtain all of the information in the hands of Vermont Yankee. The Board subsequently ruled that the company could recover replacement power costs of $4,372,000 in one year by adding this amount to the purchased power costs for that year.

On appeal, appellants VPIRG and the Department assert the same two major arguments as grounds for reversal, first, that the Board order constituted retroactive ratemaking, and second, that the issue of GMP's prudence in incurring the replacement power costs should not have been severed and assigned "to a generic investigative docket that has yet to be opened." Appellants assert that by declining to address the management prudence issue, the Board in effect relieved GMP of its burden of proof in the proceeding below.

I.

### Retroactive Ratemaking

VPIRG argued before the Board that recognition of the costs of replacement power due to the unscheduled Vermont Yankee outage would constitute recovery of a past loss. The Board in its findings did not disagree: "This assertion is clearly correct, and it is also true that Vermont law prohibits the recovery of past losses as a general proposition," citing *In re Central Vermont Public Service Corp.*, 144 Vt. 46, 53-56, 473 A.2d 1155, 1159-60 (1984).

The Board held, however, that the prohibition did not extend to the future recovery of extraordinary losses. The Board said:

It is clear, moreover, that disallowance would be grossly unfair to the Company. Its rate of return on equity set in past cases has been based on the assumption, among others, that the loss of a major generating source for extraordinary repairs would be accorded the kind of treatment we are providing for in this order. If this treatment is not to be permitted, not only would there be a serious question as to whether the Company has been afforded a fair opportunity to earn a reasonable rate of return, *Bluefield Water Works and Improvement Co.* v. *Public Service Commission*, 262 U.S. 679, 692-92 (1923), it would also imply the need for an upward revision of the rate of return in *all* cases in the future. Such a revision, of course, would have to be based on a prediction of inherently unpredictable events—the occurrence of extraordinary plant shutdowns.

■    The Board's conclusion was correct. Once it is clear that a particular cost is "extraordinary" and that it does not result from company mismanagement, or imperfect forecasts, treatment of such costs through appropriate amortization in future rate determinations does not constitute a "true-up" of past calculations, because a truly extraordinary cost by definition would not be factored into the original rate. See *In re Central Vermont Public Service Corp., supra,* 144 Vt. at 57, 473 A.2d at 1161. The Board put it this way:

Average performance, based largely on a particular plant's own operating history, is generally what is presumed in the setting of rates. Ordinary deviations from that rate of performance do not result in future adjustments, and that is true whether actual performance is inferior, resulting in additional costs to the utility, as well as superior, resulting in lower costs. What is at issue here is not the treatment of ordinary deviations from the norm, but of extraordinary events which result in plant shutdowns.

VPIRG does not argue that it was improper for the Board to have used a test year as the basis for determining just and reasonable rates. This Court has recognized that revenue and expense data from the test period, with appropriate adjustments, may be

used to estimate the rate of return to be produced by a given rate schedule. See *In re Green Mountain Power Corp.*, 142 Vt. 373, 383, 455 A.2d 823, 827 (1983). By definition, test-year projections must rely on typical or average assumptions; including extraordinary events within those assumptions will tend to distort rates and defeat the purpose of ratemaking. The common practice is to amortize extraordinary costs in the years after they happen. See *Narragansett Electric Co.* v. *Burke*, 415 A.2d 177, 179-80 (R.I. 1980).

VPIRG assumes that once a rate is set by the Board based on test-year assumptions, any losses the utility experiences are to be absorbed by it as part of the risks of being in business. For reasons we have just discussed, the Board did not attempt to include extraordinary events within its rate assumptions. But once GMP paid for replacement power required by the extraordinary and unexpected outage at Vermont Yankee, that item became a recoverable cost.

The Board acknowledged that there was merit in the proposal of the Department to rely less on the deferral and amortization of extraordinary expenses due to Vermont Yankee shutdowns by employing a four-year rolling average that would include what the Department called "typical" and "extended" forced outages, both of which are relatively predictable and certain to occur. But the Board and the appellants disagree over the definition of "extraordinary."

Appellants argue that the phenomenon of the unplanned, extended outage at Vermont Yankee cannot be considered extraordinary in light of the frequency of outages—even unplanned, extended outages—in the history of the plant. The Board itself concedes the frequency of Vermont Yankee outages in general, and even cites the frequency factor as a reason to amortize the costs of the unplanned, extended 1983 outage over a one-year period, stating:

> The Board's view with respect to the Vermont Yankee outage cost differs from that of GMP and the Department. The Board's policy is that current rates should reflect current costs. In the past, extended outages of Vermont Yankee were viewed as unusual events which would not occur on a regular basis; therefore, spreading the cost of these outages over a five-year period was considered to be reasonable.

History has proven this assumption to be false since Vermont Yankee outages have occurred more frequently than every five years. In fact, Vermont Yankee has experienced extended outages in 1980 and 1983, and will incur a major outage of at least thirty-two weeks starting September of 1985. Therefore, the Board concludes that Vermont Yankee outage costs should be recovered over a shorter period of time. Specifically the entire 1983 outage cost disputed in this case should be collected through rates prior to the 1985 outage.

The appellants argue, logically, that if extended outages of Vermont Yankee are events that will occur on a regular basis, then they should be treated like any other power cost and factored into the rate assumptions, if not on the basis of a simple test year (which might, by chance, experience no outage at all), then on the basis of a multiple-year rolling average. According to the appellants' theory, failing to include events that occur with some frequency and that affect the cost of power would be tantamount to sanctioning the true-up methodology we declared invalid in *In re Central Vermont Public Service Corp., supra,* 144 Vt. at 56-58, 473 A.2d at 1160-61.

Appellants argue further that the 1983 events—unlike the truly unpredictable accident at Three Mile Island—were, by their nature, the kinds of events that should have been lumped together with other extended forced outages and normalized, just like other embedded costs that go into a rate determination. Appellants argue that since this was not done, the deferral and amortization of these costs were improper as retroactive ratemaking.

While it is possible over future years that events like the IGSCC problem might become so common as to be declared virtually certain to occur, the appellants did not present the Board with convincing evidence that the events giving rise to the 1983 unplanned outage costs were either certain to occur, were predictable, or should have been deemed ordinary by the Board. While the bright line that separates the ordinary from the extraordinary where natural disasters are at issue, see, e.g., *Narragansett, supra,* 415 A.2d at 180, is missing where a plant breakdown arises from the nature of its design or operation, we have no hesitancy to say in this case that there was abundant evidence on the record to permit the Board to conclude that the IGSCC was distinguish-

able from refueling shutdowns or other shutdowns contemplated as normal when a nuclear plant goes on line.

Consequently, the Board did not err when it allowed GMP to recover the costs of the unscheduled 1983 outage resulting from the IGSCC.

## II.
### The Prudence of GMP Management

VPIRG's second major contention is that Green Mountain Power might have avoided the additional purchase power and production costs if GMP management had taken prudent action to effect the piping replacements in an orderly manner by pre-ordering the replacement materials and by the pre-development of replacement contingency plans. It was VPIRG's position that GMP's 17.9% common stock interest in Vermont Yankee provided sufficient clout to dictate Vermont Yankee policies.

The VPIRG case on the prudence of GMP management was never fully presented. The Board on March 16 and April 5, 1985, issued orders limiting VPIRG's discovery on this issue, and while VPIRG did present a witness, David Schlissel, who testified that GMP should bear all the costs associated with the unscheduled outages, the Board struck this evidence in its final order. As a result, VPIRG contends, the Board erred in two ways: first, by violating due process and state laws and evidentiary rules that govern procedures in rate matters before the Board, and second, by effectively ignoring GMP's burden of proof on the issue of prudence. The heart of VPIRG's argument is that the Board violated 3 V.S.A. § 809(c) of the Administrative Procedure Act (APA) concerning contested administrative cases, which states: "Opportunity shall be given all parties to respond and present evidence and argument on all issues involved."

The VPIRG citation to § 809(c) leaves unanswered the critical question: What are the issues properly involved? The Board's rulings on discovery and the striking of the Schlissel testimony stem from the explicitly stated decision to postpone consideration of the prudence issue:

> The basis of our rulings was that the relevance of this issue was highly speculative and that its enormous complexity threatened to prevent us from completing this case within the statutorily mandated period. See 30 V.S.A. § 227. [Foot-

note omitted]. Our inquiry would have had to involve not only the technical question of whether the proper course of action was taken, but also whether GMP, had it chosen the course urged by VPIRG, could have effected it. (GMP is a minority shareholder in Vermont Yankee Nuclear Power Corporation, and all of the other owners approved the action that was, in fact taken.) The effect of those rulings was to remove the issue of the handling of the 1983 temporary repairs at Vermont Yankee from this case. Mr. Schlissel's testimony relates solely to this issue, and the Company's Motion to Strike is therefore granted.

VPIRG's response is, in effect, that the Board is powerless to dictate that an issue raised by a duly admitted party shall not be heard.

VPIRG too closely equates common law civil actions and administrative rate proceedings. In rate proceedings before the Board, the legislative mandate to complete action within seven months from the date the proceeding was instituted under 30 V.S.A. § 227(a) imposes practical limitations on the Board. Without control over its order of business, it would be difficult for any rate-setting body to perform its statutory obligations to the parties and the public. See *In re New England Telephone & Telegraph Co.*, 135 Vt. 527, 539, 382 A.2d 826, 835 (1977) (PSB "has the authority to exercise its judgment in matters of docket consolidation and updating [of test-year data]"); *Consumers' Counsel* v. *Public Utilities Commission*, 56 Ohio St. 2d 220, 227, 383 N.E.2d 593, 597-98 (1978) (commission has wide discretion over its order of business); see also *In re Green Mountain Power Corp., supra*, 142 Vt. at 380, 455 A.2d at 825 (This Court will not undertake to prescribe the many approaches to rate regulation that the Board must use.). Clearly, the power to control the order of business does not imply power in the Board to bypass substantive issues mandated by statute for consideration; however, VPIRG's contention that GMP's failure to control the actions of Vermont Yankee constituted imprudence is not such an issue.

A similar claim was made by consumer appellants in *Public Service Co.* v. *Public Utilities Commission*, 653 P.2d 1117, 1121 (Colo. 1982), where they argued, among other things, that the limitation on issues to be considered meant that the hearing was not "granted at a meaningful time and in a meaningful manner."

See *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965). Noting that the appellants had been given full opportunity to contest all aspects of the company's rates in a proceeding concluded two months earlier, and would have a similar opportunity in a proceeding filed prior to the Commission's decision in the case under appeal, the Supreme Court of Colorado held that the Commission did not err "in adopting its abbreviated procedure and limiting the issues to be considered." *Public Service Co., supra*, 653 P.2d at 1122; see also *GTE Sprint Communications Corp.* v. *AT & T Communications, Inc.*, 230 Va. 295, 302, 337 S.E.2d 702, 709 (1985).

In the case before us, the Board had the discretionary authority to postpone consideration of issues that vitally affected the interests of other utilities. Its decision in this regard may only be disturbed on appeal if the Board abused its discretion, and we find that it did not do so.[2]

According to appellants, the discovery requests denied by the Board would have shed light on the status of Vermont Yankee's (and hence GMP's) knowledge about the IGSCC pipe cracking before the 1983 outage. Even if we assume that Vermont Yankee and GMP had such information, appellants did not offer to show that GMP was in a position to substitute its judgment for that of the Vermont Yankee board and officers. While the appellants' assumption throughout this proceeding has been that GMP is so closely identified with Vermont Yankee management that the imprudence of Vermont Yankee, once proven, could be, ipso facto, imprudence of GMP, we note that GMP is but a minority shareholder in Vermont Yankee. A case for such a derivative theory of liability is not inconceivable, but the appellants did not lay an adequate foundation for it in this case. The only attempt to forge this vital link in appellants' case was the testimony of David A. Schlissel, who was asked what he meant by the phrase the "management" of GMP. He responded:

---

[2] In addition to their assertions under § 809(c) of the APA, appellants also argue that severance of the prudence issue violated 30 V.S.A. § 226(c), Board Rules 2.209(A)(3), 2.209(B), 2.11, 2.14, and 2.16, in addition to V.R.C.P. 26, 33, and 34. None of these provisions narrow the PSB's authority over the scope of proceedings before it or compel a result different from the one we reach under § 809(c) of the APA.

When I use the word "management" I mean the management of both the Vermont Yankee Nuclear Power Corporation and the Green Mountain Power Company. I understand that Green Mountain Power only owns a 20 percent share of Vermont Yankee. However, I do not believe that this ownership share should permit Green Mountain management to escape responsibility for the prudence of replacement power and maintenance costs incurred during the unscheduled 1983 and 1984 outages. The mere form of plant ownership does not alter management's burden to prove the prudence of any expenses, particularly, where, as here, the power from Vermont Yankee (ordinarily 92 megawatts) represents almost ½ of Green Mountain Power's average load. In this circumstance, prudent management must exercise the utmost scrutiny of all costs associated with that plant capacity. That responsibility cannot be delegated away to Vermont Yankee management.

If GMP were legally responsible for the prudence of the decisions made by Vermont Yankee management—for example, if the plant were one of GMP's production facilities and was not jointly owned—the witness would be correct that such responsibility would be nondelegable. Again, VPIRG's theory on the prudence issue assumes GMP's control over Vermont Yankee, and no foundation for such theory was established.

In sum, the Board denied appellants' discovery requests, and struck the Schlissel testimony because of the "highly speculative nature of the claims" involved. The outcome of appellants' discovery motions might have been very different in a common law civil action, but the Board's explanation for the difference in its order on discovery is apt:

30 V.S.A. § 227 and Rule 26(b) must, for present purposes, be read together: section 227 means that, unlike the civil courts for which the Rules of Civil Procedure were principally designed, we do not have the luxury of an indefinite time frame within which to decide cases. In imposing the seven month limit, the legislature must be deemed to have given us sufficient control over matters brought before us to enable us to complete proceedings within the time prescribed. We think this means, at a minimum, that we are not obligated to litigate issues of enormous complexity under

circumstances where no probability has been demonstrated that the exploration of those issues will have any effect whatever on the outcome of the case.

Finally, appellants contend that the Board order severing the prudence issue effectively relieved GMP of its burden of showing the prudence of the costs incurred by GMP resulting from the 1983 unplanned outage at Vermont Yankee. But GMP properly established a prima facie case on the issue of its prudence in purchasing replacement power during the 1983 outage. That was all GMP was compelled to do. See *Latourneau* v. *Citizens Utilities Co.*, 125 Vt. 38, 41-42, 209 A.2d 307, 311 (1965). No party contested that GMP properly sought and secured replacement power at the lowest possible cost during the outage. VPIRG's argument on burden of proof amounts to a restatement of its assertion that its prudence issue—the issue of GMP's proper role in Vermont Yankee decisionmaking—should not have been severed by the Board, a matter we have already addressed.

*Affirmed.*