**OFFICE OF CONSUMER ADVOCATE, Appellant,**

v.

**IOWA STATE COMMERCE COMMISSION, Appellee,**

and

**Iowa Electric Light & Power Company, Intervenor–Appellee,**

**Iowa Ratepayers Association, Inc., Intervenor–Appellant.**

**IOWA ELECTRIC LIGHT & POWER COMPANY, Appellee,**

v.

**IOWA STATE COMMERCE COMMISSION, Appellee,**

and

**Office of Consumer Advocate and Iowa Ratepayers Association, Inc., Intervenors–Appellants.**

**No. 87–933.**

Supreme Court of Iowa.

Aug. 17, 1988.

As Corrected Aug. 23, 1988.

Ben Stead, Office of the Consumer Advocate, Des Moines, for appellant.

Roger D. Colton, Nat. Consumer Law Center, Boston, Mass., for appellant Iowa Ratepayers Ass'n, Inc.

Diane Munns and Vicki Place, Assts. Gen. Counsel, for appellee Iowa State Commerce Com'n.

Thomas J. Pitner and Jonathan M. Rogoff, Cedar Rapids, for appellee Iowa Elec. Light & Power Co.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO and ANDREASEN, JJ.

ANDREASEN, Justice.

The Office of the Consumer Advocate (Consumer Advocate) and the Iowa Ratepayers Association, Inc. (Ratepayers Association) appeal from the district court order that affirmed a decision of the Iowa State Commerce Commission[1] (Commission) in an electric rate case. The Commission had granted part, but not all, of the rate increase requested by Iowa Electric Light and Power Company (Iowa Electric).

There are three basic areas of controversy in this appeal. The first issue stems from a power supply agreement between Iowa Electric and the City of Muscatine. Under the agreement, Iowa Electric was required to pay the city a capacity rate charge based upon a 1.85 multiplier of

---

1. The Iowa State Commerce Commission is now known as the Utilities Board. *See* Iowa Code § 474.1 (1987).

costs. The second issue concerns a $16.5 million assessment against Iowa Electric by the federal government under the Nuclear Waste Policy Act of 1982. The final issue challenges the Commission's adoption of a fifteen-year amortization period for the flow-back of accumulated deferred state and federal income taxes to customers.

### I. *Standard of Review.*

The standard of review for this appeal is found in Iowa Code section 17A.19(8) (1987). We review for errors of law or conclusions by the Commission unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole. Iowa Code §§ 17A.19(8)(e) & (f) (1987). The possibility that two inconsistent inferences may reasonably be drawn from the evidence does not preclude a finding by the court of substantial evidentiary support. *Cook v. Iowa Dep't of Job Serv.*, 299 N.W.2d 698, 701 (Iowa 1980). Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *City of Davenport v. Public Employment Relations Bd.*, 264 N.W.2d 307, 311 (Iowa 1978). The agency, not the court, weighs the evidence, and its findings will be broadly and liberally construed to uphold rather than defeat its decision. *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 591 (1971).

As we stated in *Davenport Water Company v. Iowa State Commerce Commission:*

Our limited factual review [in a rate case] is as it should be, since Commission presumably has at its disposal the facilities and expertise with which to appropriately resolve detailed and complicated fact questions. This means we can intercede only when Commission is clearly shown to have acted unconstitutionally, in violation of statutory mandate, or absent substantial support in the record.

190 N.W.2d at 591–92 (citations omitted). Additionally, because the Commission's power to fix rates is legislative in origin, "we have no authority to determine whether it acted wisely in adopting any policy or plan merely because it is or is not to our liking." *Id.* at 592 (citations omitted). With this standard of review as a background, we now consider the issues on appeal.

### II. *1.85 Multiplier.*

Iowa Electric entered into an agreement with the City of Muscatine for the purchase of power. Under this agreement, the cost to Iowa Electric was their proportional share of the costs of producing the electricity multiplied by 1.85. The Consumer Advocate challenged this 1.85 multiplier as an unjust and unreasonable payment by Iowa Electric. The Commission upheld the portion of the agreement involving the 1.85 multiplier but rejected portions of the agreement which the Commission found to be unreasonable. The Consumer Advocate appealed this ruling on two grounds. First, the Consumer Advocate claimed that there were insufficient findings of fact by the Commission to support their approval of the 1.85 multiplier. Additionally, the Consumer Advocate claimed that the 1.85 multiplier was unreasonable and unjust under Iowa Code section 476.8 (1987). The district court upheld the Commission's ruling. The Ratepayers Association and the Consumer Advocate appeal from that district court ruling.

We find that the Consumer Advocate's challenge to the sufficiency of the Commission's finding of fact is without merit. The Commission's opinion provided:

Company [Iowa Electric] argues the record is devoid of any evidence that cheaper alternatives to acquire power were available to the Company [Iowa Electric]. Moreover, the evidence demonstrates the multiplier was necessary to receive the credit rating in order to market the original and refund ending balance successfully, according to Company [Iowa Electric]. The contract was negotiated at arm's length and in good faith, Company [Iowa Electric] says, and thus, its proposed adjustment for capacity payments should be adopted.

In evaluating the Commission's finding of facts, we review the entire opinion. When viewed in its entirety, the opinion demonstrates that the Commission noted their responsibility to review the evidence concerning the agreement between Iowa Electric and the City of Muscatine. The Commission mentioned several reasons for their approval of the 1.85 multiplier. Although the discussion by the Commission was not lengthy or elaborate, it was sufficient to withstand the challenge of the Consumer Advocate.

We now consider whether the 1.85 multiplier is unjust or unreasonable under Iowa Code section 476.8 (1987).

Iowa Code section 476.8 provides:

The charge made by any public utility ... for any service rendered ... shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful.

The Consumer Advocate claims that Iowa Code section 476.8 allows only "just, reasonable and prudent actual costs" to be recovered by a public utility from its customers. They argue that any payment by Iowa Electric for expenses that exceed the *actual cost* of the services provided to Iowa Electric is in excess of the amount allowed by Iowa Code section 476.8 and cannot be passed on to their customers. While the Code limits profits paid by a utility to a just and reasonable amount, Iowa Code section 476.8 does not prohibit a public utility from passing on that portion of their expenses that represent a just and reasonable profit to the suppliers of the public utility. *See General Tel. Co. v. Iowa State Commerce Comm'n*, 275 N.W. 2d 364, 367 (Iowa 1979).

The Consumer Advocate asserts that the 1.85 multiplier represented eighty-five percent pure profit for the City of Muscatine. Iowa Electric introduced evidence that the 1.85 multiplier was necessary for the City of Muscatine to receive a bond rating which would allow Muscatine to successfully market the original and refinancing bonds allowing construction of the power plant. Furthermore, there is testimony that Iowa Electric had limited options available for the purchase of electricity.

Whether the 1.85 multiplier is just and reasonable amounts to a question of fact. When a fact question is at issue, this court will affirm the Commission's action if there is substantial evidence in the record to support the ruling. *See Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n*, 359 N.W.2d 491, 498 (Iowa 1984). Our narrow standard of review will not allow us to substitute our preference for that of the Commission if there is substantial evidence to support their ruling. *See Davenport Water Co.*, 190 N.W.2d at 592. In this case, there was evidence introduced which showed that the 1.85 multiplier was the product of arm's length negotiations designed to meet the needs of both Iowa Electric and the City of Muscatine. There is also evidence that these negotiations were conducted in good faith.

Based on projections made in 1976, Iowa Electric believed it would be unable to generate sufficient power to meet its anticipated needs beginning in the summer of 1982. Iowa Electric was able to fill most of this anticipated deficiency by contracting with other private utilities, however, it was unable to contract for all of the anticipated needs. The 1978 power supply agreement with the City of Muscatine provided Iowa Electric with the additional capacity to meet their anticipated needs. The power supply agreement also provided the City of Muscatine with enough projected revenue to construct a generating facility. We find that there is substantial evidence in the record to support the Commission's ruling in regard to the 1.85 multiplier. We affirm the Commission's ruling and the district court's review of that decision.

### III. *Nuclear Waste Disposal Costs.*

The Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101–10226 (1982) (NWPA), provided for a one-time assessment to utility companies having nuclear generation for electricity generated by their power plants prior to April 7, 1983. *Id.* at § 10222(a)(3). This fee was collected to help provide for the permanent storage of nuclear waste.

Prior to the passage of the NWPA, many individuals trained in the development of nuclear power envisioned temporary storage and reuse of spent nuclear fuel. This technology did not develop and the NWPA represented the final decision of the federal government to maintain permanent storage of nuclear waste. Iowa Electric's one-time assessment under the NWPA for disposal costs prior to April 7, 1983, was $16.5 million. Based on the opinions and projections of Iowa Electric, $4.2 million had been raised from the customers to cover this expense. This leaves a deficiency of approximately $11.8 million which Iowa Electric intends to pass on to its customers.

■ The Consumer Advocate and Ratepayers Association challenge this as retroactive rate making, which is prohibited. *See* Iowa Code § 476.7 (1987); *Oliver v. Iowa Power & Light Co.*, 183 N.W.2d 687, 689 (Iowa 1971); *see also Federal Power Comm'n v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 153, 83 S.Ct. 211, 215–16, 9 L.Ed.2d 199, 205 (1962); *Nader v. Federal Communications Comm'n*, 520 F.2d 182, 202 (D.C.Cir.1975) ("It is ... a cardinal principle of rate making that a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle."); *State ex rel. Utility Consumers of Mo.*, 585 S.W.2d 41, 59 (Mo.1979); *Providence Gas Co. v. Burke*, 475 A.2d 193, 197 (R.I.1984); *Narragansett Elec. Co. v. Burke*, 415 A.2d 177, 179 (R.I.1980). Generally, the prohibition on retroactive rate making prevents a utility company from recouping losses from past company mismanagement or improper forecasting. *See Wisconsin's Env't Decade, Inc. v. Public Serv. Comm'n*, 98 Wis.2d 682, 298 N.W.2d 205, 212 (App.1980) (unable to recoup losses due to mismanagement). There is an exception to this general rule, however, which allows future rate adjustment for losses due to extraordinary events which were unforeseeable. *See Spitzer v. City of Waterbury*, 113 Conn. 84, 90, 154 A. 157, 160 (1931) (winter storm in New England described as extraordinary event); *Providence Gas Co. v. Burke*, 475 A.2d 193, 198 (R.I. 1984); *In re Green Mountain Power Corp.*, 147 Vt. 509, 514–15, 519 A.2d 595,

598–99 (1986) (unscheduled shutdown of nuclear plant for repairs was extraordinary event).

■ We must determine if there is substantial evidence to support the commission's finding that the one-time assessment was an extraordinary, unforeseeable expense rather than a reasonably foreseeable expense. To resolve this issue we consider the background and development of the NWPA.

The Nuclear Waste Policy Act addresses the safe and permanent disposal of nuclear waste and spent fuel. Spent fuel from nuclear reactors is intensely radioactive. Initially, it was believed that the spent fuel would be reused, therefore, the storage facilities were designed to accommodate only short-term storage. When the technology for reprocessing the spent fuel did not develop, the possibility of overfilling the temporary storage facilities became a problem of great urgency. To address that problem, the NWPA established a Nuclear Waste Fund, consisting of fees assessed to the operators of nuclear power plants. *See* 42 U.S.C. § 10222 (1982). Courts have recognized that the decision to utilize permanent disposal of spent fuel rather than temporary storage and reuse of that fuel encompassed a considerable amount of scientific, political, and social debate. *See Pacific Gas & Elec. Co. v. Energy Resources Comm'n*, 461 U.S. 190, 195–96, 103 S.Ct. 1713, 1717–18, 75 L.Ed.2d 752, 759–60 (1983); *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 252–53 (4th Cir.1987); *State of Tennessee v. Herrington*, 806 F.2d 642, 644 (6th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *Towns of Concord, Norwood and Wellesley v. Federal Energy Regulatory Comm'n*, 729 F.2d 824, 825 (D.C.Cir.1984).

When the history surrounding the development of the NWPA is compared with other circumstances which have satisfied the extraordinary occurrence exception, we find that the one-time fee assessed against Iowa Electric must be considered an unforeseeable, extraordinary event. *Cf.*

*Green Mountain Power Corp.*, 147 Vt. 509, 514–15, 519 A.2d 595, 598–99 (1986) (unscheduled shutdown of nuclear power plant for repairs was "extraordinary" event); *Spitzer v. City of Waterbury*, 113 Conn. 84, 90, 154 A. 157, 160 (1931) (extraordinary winter storm); *Narragansett Elec. Co. v. Burke*, 415 A.2d 177, 179 (1980) (extraordinary winter storm); *Town of Milton v. Railroad Comm'n*, 185 Wis. 294, 295, 201 N.W. 381, 382 (1924) (public utility allowed to recoup loss from equipment which was prudently purchased but became uneconomical due to changing technology). It would be unrealistic for this court to hold that Iowa Electric should have accurately predicted the technological developments and legislative action surrounding the NWPA. We affirm the district court's and Commission's rulings that allow this expense to be passed on to the customers of Iowa Electric.

IV. *Fifteen–Year Amortization Period.*

█ The Consumer Advocate challenges the Commission's allowance of a fifteen-year amortization period for the flow-back to Iowa Electric customers of accumulated deferred state and federal income taxes. According to the Consumer Advocate, a five-year period would allow more of the customers that actually paid the excess tax to receive the return. The Consumer Advocate also cites other cases in which the Commission has used a five-year amortization period.

The Commission and the district court were correct in not relying on previous Commission decisions which utilized a shorter period of amortization. "Agency decisions in contested case proceedings do not have the binding effect of statutes or rules, and the commission's prior decision was of limited precedential value." *Iowa Planners Network v. Iowa State Commerce Comm'n*, 373 N.W.2d 106, 112 (Iowa 1985) (citations omitted). Our review of the record indicates that there was support for the fifteen-year amortization period. According to Iowa Electric, a five-year amortization period would create a mismatch of income and expenses which would be detrimental to future customers. In light of our standard of review, we should not disturb the decision of the Commission because there is a competing and credible viewpoint. We find the fifteen-year amortization period to be reasonable and supported by substantial evidence. We affirm that portion of the Commission's decision.

AFFIRMED.