In re Petition of Twenty-Four Vermont Utilities, Pursuant to 30 V.S.A. § 248, for a Certificate of Public Good Authorizing Execution and Performance of a Firm Power and Energy Contract with Hydro-Quebec and a Hydro-Quebec Participation Agreement (New England Coalition for Energy Efficiency and the Environment and the Grand Council of the Cree (Quebec), Appellants)

[618 A.2d 1295]

No. 91-154

Present: Allen, C.J., Gibson, Dooley and Morse, JJ., and Bryan, Supr. J., Specially Assigned

Opinion Filed October 2, 1992

Motion for Reargument Denied November 25, 1992

*John H. Marshall* and *Holly Ernst Groschner* of *Downs Rachlin & Martin*, St. Johnsbury, for Petitioners-Appellees.

*Bonnie Barnes, William K. Sessions, III, James Allen Dumont,* and *Chris McAnany*, Law Clerk (On the Brief), of *Sessions, Keiner, Dumont, Barnes & Everitt*, Middlebury, for Intervenors-Appellants.

*James Volz*, Director for Public Advocacy, and *Robert V. Simpson, Jr.* and *John L. Hodge*, Special Counsel, Montpelier, for Appellee Department of Public Service.

**Dooley, J.,** On October 12, 1990 and January 7, 1991, the Public Service Board granted petitioners, twenty-four Vermont utilities, interim and then conditional approval, pursuant to 30 V.S.A. § 248, to purchase more than four billion dollars worth of electricity over a thirty-year period from Hydro-Quebec (HQ), a Canadian producer of electricity. The New England Coalition for Energy Efficiency and the Environment (NECEE) and the Grand Council of the Cree (the Cree) intervened before the Board to oppose the purchase, and now appeal the Board's approval. They argue that (1) the Board erred in basing its own detailed analysis of statewide need for the purchase on evidence not properly before it; (2) the Board's finding that the purchase of 340 megawatts of electricity on an annual basis from HQ would not require the construction of new production facilities in Quebec, and therefore would not threaten Vermont wildlife, was clearly erroneous; (3) the Board erred in refusing to allow intervenors to present evidence on the impact of a Canadian agency ruling offered after the close of evidence on the implications of the reliability of HQ as an energy source, while requesting an affidavit from HQ as a condition of its approval; (4) the Board erred in conditionally approving the purchase on the basis of a determination of statewide need, allowing for a subsequent showing of need by the individual utilities; (5) the Board's finding of economic benefit to the state from the purchase failed to account for external economic implications of importing energy, such as the loss of jobs and tax revenue, and therefore was clearly erroneous; and (6) the Board erred in refusing to consider evidence of human rights deprivations of the Cree, a Native American population in Quebec, that would result from HQ's construction of electricity production facilities. We affirm.

## I.

On April 1, 1988, all of Vermont's electric utilities (petitioners) signed a participation agreement with HQ under which they would purchase between 340 and 450 megawatts (MW) of firm power annually pursuant to schedules that cover thirty years.[1] At a minimum, they would begin to purchase 57 MW in November 1990, and the purchase obligation would grow to 340 MW in the year 2000, declining to zero by the year 2020. The minimum purchase component was crafted to replace current contract amounts with HQ that total approximately 323 MW at present and decline over the next few years. At their option, the Vermont utilities could purchase an additional 110 MW. The participation agreement was subject to approval of the Public Service Board under 30 V.S.A. § 248(a)(1)(A) because each of the utilities will purchase "electric capacity or energy from outside the state, for a period exceeding five years, that represents more than one percent of its historic peak demand."

After thirty-four days of evidentiary hearings, the Board approved the minimum purchase amount in the aggregate, subject to a specific showing of need for the amount to be distributed to each utility. There were twelve conditions attached to the approval, including that: (1) all amounts above the minimum be cancelled or the petitioners make a separate showing that the additional purchases will promote the general good of the state and will be supplied by existing HQ facilities; (2) petitioners file an affidavit from HQ stating that HQ is obligated to provide the power under the agreement irrespective of regulatory action on licensing and construction of specific facilities, that any shortfalls in power or energy caused by delay or cancellation of generating facilities would be distributed equitably among all purchasers, and that damage and compensation provisions would apply if the National Energy Board of Canada took certain adverse action; (3) each utility would file within sixty days statements supporting its allocation of power;

---

[1] There are actually two contracts, the contract with HQ and the participation agreement. The contract with HQ is entered into by the nine utilities that are the joint owners of the Highgate Interconnection, through which the energy will enter Vermont. Under the participation agreement, the power and energy is distributed to all utilities in the state at cost.

(4) each utility must "develop and implement measures to acquire all resources available from cost-effective acquisition of energy efficiency"; and (5) each utility must file a statement of efforts to sell back to HQ power and energy not needed in the short term. Overall, the Board found that the HQ contract "will provide a source of economic and reliable power" that would save Vermont ratepayers $500 to $700 million over the life of the contract.

The conditions ordered by the Board are similar to those sought by the Vermont Public Service Department, which urged the Board to approve the basic contract but not the additional 110 megawatts. The Department argued for greater specificity in the utilities' obligation to pursue energy efficiency measures. Before the Board, the main opponents of the purchase were the Cree and NECEE [hereinafter intervenors], and they were joined by the Conservation Law Foundation, Vermont Natural Resources Council and Vermont Public Interest Research Group. Generally, the opponents argued that the purchase did not meet the standards of § 248(b) and thus did not promote the general good of the state. The Cree emphasized the adverse environmental consequences in both Quebec and Vermont, and the effect on their way of life. Many of the opponents argued that the energy needs of the state could be met by demand-side management (DSM)—that is, investments in energy efficiency measures that would reduce demand at a cost less than that of increased supply. They were joined in that position by the Vermont Independent Power Producers Association (VIPPA), who also argued that the state's needs could be met by in-state renewable resources and cogeneration. Only the Cree and NECEE appealed the Board's order.[2]

## II.

Intervenors first argue that the Board erred in relying on its own technical analysis of the need for the HQ power. The circumstances connected with this argument are somewhat complicated and require a detailed explanation.

To address one of the statutory approval criteria, see 30 V.S.A. § 248(b)(2), the Department of Public Service (DPS) re-

---

[2] National Audubon Society filed a notice of appeal although it did not actively participate before the Board. It joined in the brief filed by intervenors.

tained Energy Systems Research Group, Inc. (ESRG), to do a detailed analysis of the monetary savings to Vermont rate-payers from the HQ contract, as opposed to alternative sources of supply or demand-side management (DSM) actions. The analysis was based in part on research done by the staff of DPS and a Vermont electric utility dispatch-and-revenue-require-ments computer model called "UPLAN." The results of the analysis were contained in a long report which concluded that approximately $134 million in present value (1989 dollars) bene-fits would accrue to Vermont ratepayers in the form of reduced electric rates from the HQ contract over the period from 1990 to 2018.

ESRG analyzed two levels of demand-side management that they called moderate DSM and strong DSM. Intervenors and others attacked the ESRG report on a number of grounds, but the strongest attack focused on its treatment of DSM. In inter-venors' view, more intense DSM would eliminate the need for the HQ contract. Responding in part to that criticism, ESRG did further analysis while the case was progressing and, in re-buttal, presented new conclusions based on an increased level of DSM that would reduce Vermont's peak load by 27% and its energy demand by 20% in the year 2000. ESRG concluded that even at this "intensified" level of DSM (IDSM), the HQ contract would provide significant financial benefits to the ratepayers of Vermont.

During the course of the hearings, a staff member of the Board asked the parties to "hand over any Lotus 1-2-3 work-sheets they relied on in analyzing the Hydro Quebec purchase." The main subjects of this request were the worksheets underly-ing the ESRG analysis.. The request led to an on the record discussion between the parties and the Chairman of the Board about the Board's power to make independent computer runs from the programs used by the witnesses. The Chairman took the view that the Board had the power to make such runs but had to rely on record evidence in developing the computer run, and also needed to state explicitly in its findings how the run was made so that "anybody can understand how the conclusion was arrived at." Intervenors did not object to the Board's re-quest or position on computer runs. Following the close of the evidence, a Board staff member wrote DPS specifying the

ESRG information the Board wanted and requesting that this information be provided on floppy disks in computer-readable files. The request included ten categories of items. DPS complied with it.

The Board's decision indicates that it did independent analysis based on the ESRG methodology and programs. After first summarizing the results of the ESRG analysis based on "strong" and "intensified" DSM, the Board went on to say in its findings:

> In order to test this argument [that higher levels of DSM were feasible and would preclude the need for the HQ contract], the Board conducted an independent analysis of the record evidence in order to determine just what level of efficiency achievements would be necessary in order to replace the Contract with a more cost-effective combination of supply and efficiency resources. The analysis indicated that efficiency measures would have to reduce Vermont's otherwise-expected total electric requirements by at least 30 percent before efficiency improvements would conflict with the long-term economic benefits of the Contract. Even that conflict depended upon assumptions that alternative fuel prices would not rise rapidly. In any case, no economic conflict with the Contract would emerge at any level of efficiency achievements, if Contract power could be resold without a loss.

The Board also analyzed each of the potential sources of conflict, and found it unlikely that any of the three sources—the 30% decrease in demand, the small rise in alternative fuel prices and the lack of market for resale of HQ power—would occur.

Later findings detail how the Board used the DPS-supplied computer files and programs. They primarily were used for the individual data elements supporting the ESRG analysis. The Board did, however, use spreadsheet programs to analyze the cost savings when DSM was further increased to reduce demand by 30%. The data on which this analysis was conducted come from other DPS computer files used in creating the ESRG report and identified in the Board's findings.

It is helpful to our determination to set forth the positions of the parties in detail. Intervenors' position is that the Board re-

lied upon computer programs and data not part of the record to create evidence, on which it then relied to reach its decision. They argue that the Board's procedure violated a number of provisions of the Administrative Procedure Act, most notably 3 V.S.A. § 809(g), which requires that findings be based exclusively on evidence in the record and matters officially noted.[3]

Intervenors argue that the situation here is similar to that present in *In re Green Mountain Power Corp.*, 131 Vt. 284, 305 A.2d 571 (1973), where this Court rejected the rate design decision of the Board because it was based in part on nonrecord evidence. In that case, the Board adopted a rate design different from those proposed by the utility and the expert witness for the public, based in part on its "'knowledge that energy costs [were] rapidly increasing, with the result that the tail blocks of certain rate schedules [were] below long-run variable cost.'" *Id.* at 304, 305 A.2d at 583 (quoting PBS supplemental findings of fact, July 19, 1972). The Court characterized this statement as official notice of judicially cognizable facts without the procedural protections for the parties that are specified in 3 V.S.A. § 810. *Id.* at 304–05, 305 A.2d at 583. Once that information was struck, the Court found that the evidence in the record did not support the rate design. *Id.*

Petitioners and DPS argue, to the contrary, that the Board used its expertise to make new calculations based on data in the record. They point out that some of the computer files were introduced into evidence, and that others were obtained by the Board with the knowledge of intervenors and without objection. In their view, the Board's action fits squarely within the last sentence of 3 V.S.A. § 810: "The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence." They also argue that intervenors failed to make a timely objection to the procedure.

Petitioners and DPS rely on two decisions of this Court, *In re Telesystems, Corp.*, 143 Vt. 504, 469 A.2d 1169 (1983), and *In re Continental Telephone Co.*, 150 Vt. 76, 549 A.2d 639 (1988).

---

[3] They also argue that the Board violated 3 V.S.A. § 810(3), by preventing cross-examination on its calculations, and 3 V.S.A. § 809(c), which provides parties the right "to respond and present evidence and argument on all issues involved."

*Telesystems* dealt with the power of the Board to change findings that were adopted by a hearing officer. Quoting *Vermont Electric Power Co. v. Bandel*, 135 Vt. 141, 147, 375 A.2d 975, 980 (1977), this Court stated that the Board could "rework the findings in the light of its own special competence." 143 Vt. at 508, 469 A.2d at 1171. *Continental Telephone* involved the Board's determination of rate of return. We stated: ·

> Since the rate of return is an artificial attempt to translate into a monopolistic enterprise the realities of the competitive marketplace in terms of the utility's future earnings, it rests heavily on assumptions, estimates and projections of the future. Rate of return can be as inexact as the usual evidentiary development of future damage awards in cases involving tortious physical injury. If it were subject to precise measurement, applying a mere mathematical formula could do the task of the Board. Instead, the standards of [the statute] call for and expect the application of the expert judgment and expertise of the Board.

150 Vt. at 77–78, 549 A.2d at 640. According to petitioners and DPS, the Board reworked the findings as authorized by *Telesystems* and applied its expert judgment to the raw evidence as authorized by *Continental Telephone*.

In evaluating these arguments, we are influenced by the fact that we are dealing with sophisticated modeling of Vermont's future energy supply and demand alternatives. The models are simplified images of reality based on mathematical equations, reduced here to computer spreadsheets. The ESRG model was critical to the Board's analysis of the economics of the HQ contract. After noting that the evidence offered by the opponents of the contract failed to quantify the size or pace of DSM in Vermont, the Board turned to the DPS evidence:

> Only the DPS, with its consultants, attempted a least-cost analysis of Vermont's resource portfolio on a state-wide, rather than utility-specific, basis. In essence, its analysis compared the present value revenue requirement (PVRR) of meeting Vermont's expected load with and without the Contract (340 MW), that is, with the next least costly supply options instead. It tested the changes in PVRR caused by different load growths, fuel prices, the inclusion of 110

MW of non-utility generating sources, and varying levels of DSM achievements. In almost all scenarios, the Contract produced positive PVRR savings.

As one commentator has noted, however, computer models are valuable only if the input, assumptions and methodology are absolutely clear:

> These advantages [of computer models] are lost, however, if agencies do not disclose the documentation behind the models. Without the chance to impeach these models by examining the assumptions, methodology, and data used in constructing them, the models' conclusions resemble hearsay evidence. The models' conclusions have no legal significance because the credibility of the agencies' findings rests upon the assertion of those not before a reviewing court. Forcing the public to dissect a mass of seemingly unrelated numbers and equations stifles the very purpose of the review provisions. . . . The lack of training in quantitative analysis for judges, some of whom even describe themselves as "technically illiterate," only compounds the difficulties facing parties that seek review of computer models used by administrative agencies.

Note, *Taking a Byte Out of Abusive Agency Discretion: A Proposal for Disclosure in the Use of Computer Models*, 19 J.L. Ref. 637, 647 (1986) (footnotes omitted).

■ ■ For two reasons, we believe that the Board overstepped its proper role in its separate computer runs. First, it relied in part on data and programs not in evidence.[4] The rules of evidence are relaxed in Board proceedings so that evidence

---

[4] Although the data and programs were presumably available to intervenors, they were not formally made part of the record. Thus, they are not available to us. In an appendix to petitioners' supplemental printed case, petitioners supplied us with the computer files they assert were provided to the Board and used by it. Our review of the information provided by DPS to Board staff indicates that many LOTUS spreadsheets were provided to the Board that are not part of the appendix. The Board's decision references numerous spreadsheets not contained in the appendix. For example, as the DPS brief notes, all files relating to intensified demand-side management have the letters "AGI" as their fourth, fifth and sixth characters. None of these are contained in the appendix. Nor were these files admitted into evidence. During argument, the attorney for petitioners stated that this Court could duplicate the Board's analysis from the data files and spreadsheets contained

not admissible in court is admissible by the Board if it may "illuminate the case." *In re Central Vermont Public Service Corp.*, 141 Vt. 284, 292, 449 A.2d 904, 909 (1982). There is no relaxation of the requirement, however, that evidence must be admitted before it is relied upon by the Board. See 3 V.S.A. § 809(g). Presumably, the data and programs used by the Board would have been admissible as part of the basis of the ESRG analysis and testimony. Our presumption, however, has not been tested by a formal offer with the opportunity for opponents to contest admissibility.

 Second, we believe that the Board created evidence that went beyond recalculation. As petitioners argue, the Board, unlike the DPS witnesses, did not have to make specific findings on how the level of DSM could be achieved, and at what cost. It ran a "what if" scenario that attempted to determine where the point of conflict between DSM and the HQ contract occurred and what significant variables influenced that point. Even so, the Board's actions required considerable skill and expertise, particularly in selecting the input data and assumptions. That analysis took pages to explain. Intervenors had no opportunity to challenge the methodology. Although we recognize Board expertise in evaluating evidence, the use of the skill of the Board and its staff crossed the line into evidence creation in at least part of its analysis.[5]

---

in the appendix. In fact, many more data files and spreadsheets are necessary.

[5] Although we think some of the analysis went too far, we do not accept intervenors' arguments that condemn any use of the computer files. For example, intervenors criticize the Board for determining from a spreadsheet that the cost of DSM in the IDSM scenario is three times as large as the cost of DSM in the SDSM scenario. It appears to us that the Board simply took the data from the appropriate entries in the files with no exercise of judgment as to whether that data were accurate. There is clearly no error in this action. Many of the specific steps taken by the Board were of this kind and involved no error.

Nor do we think it was error for the Board to examine a spreadsheet carefully to determine how the "parts" worked in relation to each other. As noted later, such a "close look" shows the critical significance of particular variables like fuel costs and resale price.

In our view, the Board crossed the line when it changed the input data and assumptions and ran the interrelated spreadsheets with these changes.

There was available to the Board a fairer and more open means of accomplishing the same objective. The Board could have described the question it wanted to address and asked the DPS witnesses to run their models in response. The output information would have been admissible as expert testimony, subject to cross-examination covering all of the methodology. In contrast, the process used by the Board made it impossible for intervenors to challenge the weight, accuracy and reliability of the output information before the Board made findings relying on it. However we view the Board's actions, it violated the commands of 3 V.S.A. § 810(3), (4).

For two reasons, however, we do not believe that this error leads us to reverse the Board's order. First, and most important, we cannot find that the error sufficiently tainted the Board's conclusions to require reversal. See *Jarvis v. Gillespie*, 155 Vt. 633, 638, 587 A.2d 981, 985 (1991) (errors in unessential findings do not provide basis for reversal). The analysis that went beyond the Board's proper role was a "what if" scenario that attempted to find the level of DSM that would make the contract uneconomical in comparison with DSM. Using that analysis, the Board determined that a 30% demand reduction would be needed if fossil fuel costs were lower than expected and petitioners could not resell the energy without a loss. Based on the evidence properly admitted, the Board found that the level and cost of DSM used in the IDSM case was the most likely; that fossil fuel costs would be higher than the level necessary to create a conflict; and that the HQ energy could be sold at cost or at a profit. These findings fully support the Board's conclusion that the energy needs of the state could not be met "in a more cost effective manner through energy conservation programs and measures and energy-efficiency and load management measures." 30 V.S.A. § 248(b)(2).

In reaching this conclusion, we recognize that the Board felt that its "what if" analysis was important in confirming the merit of the DPS position, and that, at one point, it stated that "no party presented sufficient evidence to persuade the Board that it had performed the appropriate and detailed analysis required to fully support approval of the Contract." Although the statement would suggest that the Board relied fundamentally on its own analysis, that suggestion is inconsistent with its fact-

finding.[6] For example, it specifically rejected the feasibility of demand reduction beyond that supported by DPS in the IDSM case, either because it is unachievable or because it cannot be achieved in a sufficiently timely fashion to avoid the need for increased supply. Consistent with those findings, it could not have denied contract approval because of the likelihood that further DSM would obviate the need. Moreover, much of the Board's analysis involved a closer look at the relevant variables that demonstrated the critical significance of fuel costs and the ability of the utilities to resell energy. We do not find error in that "closer look."

■ Second, even if the error had tainted the result, we believe that intervenors had an obligation to raise their objection to the Board before raising it here. Intervenors failed to object to the Board's procedure in obtaining the computer files. Moreover, intervenors filed post-judgment motions but failed to raise the ground asserted here.

The situation is comparable to that in *In re Quechee Lakes Corp.*, 154 Vt. 543, 580 A.2d 957 (1990), an Act 250 case in which appellant claimed that the Environmental Board relied improperly on site visit observations to determine a contested fact. We concluded that the Board could rely on the observations but committed error in failing to place the results of the site visit "on the record in order to preserve the right of rebuttal and to facilitate review." *Id.* at 552, 580 A.2d at 962. We declined to reverse, however, because we found that appellant waived the issue by failing to include it in a post-judgment motion. *Id.*; see also *In re Denio*, 158 Vt. 230, 238, 608 A.2d 1166, 1171 (1992) (same).

■ We require errors to be raised first to the Board before they are raised on appeal. See *In re New England Tel. & Tel.*

---

[6] As further support for our position, we note that in the overview explanation of its decision, the Board specifically recited the DPS IDSM case as showing that "continuing purchase of up to 340 MW from Hydro-Quebec will not interfere with the acquisition of all available, cost effective energy efficiency for Vermont" and went on to emphasize that it did not accept the evidence that demand reduction of "30 percent to 50 percent or even higher" would be "cost-effective in Vermont at this time, or that such reductions could be physically achieved within the next decade." That overview explanation of its decision does not rely on its computer analysis.

*Co.,* 146 Vt. 503, 505, 505 A.2d 680, 682 (1986). The considerations behind the *Quechee Lakes* preservation rule apply equally here. If the objection had been raised promptly, the Board could have responded to it in a way that gave intervenors an opportunity to cross-examine and rebut, and which would place all relevant information on the record. Although that response still may be possible, the passage of time makes it more difficult. It would be inappropriate to begin this proceeding again from the start to cure this error.

## III.

Intervenors claim that the Board improperly concluded that approval of the purchase contract with HQ will promote the "general good" of the state under 30 V.S.A. § 248(a)(1) because certain of the Board's findings regarding the effect the contract would have on migratory waterfowl in Vermont were incorrect. This issue arose in the Board's review of the environmental effects of the contract. Although the statute requires review of environmental factors solely with respect to an in-state facility, 30 V.S.A. § 248(b)(5), the Board ruled in a preliminary order that it would consider the environmental consequences of HQ facilities to the extent they affect the general good of the State of Vermont. It noted, however, that the purchase could "involve regional, hemispheric, and global consequences and therefore can affect the general good of Vermonters as inhabitants of the region, hemisphere, and globe." For this reason, it decided to "review and weigh in a broad manner, impacts such as . . . effects on migratory wildlife."

Intervenors argue that despite the Board's announced intention to review broadly the effects on migratory waterfowl, it failed to consider the displacement and likely destruction of populations of waterfowl that seasonally migrate through Vermont. The Board rejected this argument because it found that the current HQ facilities had no adverse effect on migratory waterfowl and that the minimum purchase amount would not cause the construction of any new facilities. The latter conclusion was based on the findings that the minimum purchase amount would, in effect, serve as a continuation of the current purchase of 323 MW from HQ, and that 340 MW represented a tiny percentage of HQ's total present output of over 24,000 MW

as well as a very small proportion of the output of HQ's planned new facilities. In reaching this conclusion, the Board did not give controlling significance to the evidence that HQ treated the contract as a new power obligation that would accelerate the construction of new facilities. In addition to the evidence set forth above, it relied on the fact that HQ incurred a system obligation to supply the power irrespective of whether new facilities would be built.

The Board treated the 110 MW optional purchase differently from the base amount. It concluded that this purchase represented an expansion of the preexisting contracts that could cause the construction of new facilities. It made extensive findings about the potential consequences of the new facilities on migratory waterfowl that enter Vermont. It concluded that it was unable to evaluate the adverse impact of the 110 MW purchase because of a lack of definitive information, and that adequate cumulative impact and assessment studies were needed before the Board could rule on the 110 MW purchase. As part of their argument, intervenors assert that the Board acted inconsistently in its treatment of the additional 110 MW purchase and should have used a similar analysis for the basic purchase.

██ ██ The question before the Board was primarily one of fact. We must accept the Board's findings of fact unless they are clearly erroneous. 30 V.S.A. § 11(b); *In re East Georgia Cogeneration Limited Partnership*, 158 Vt. 525, 531, 614 A.2d 799, 803 (1992). Further, in reviewing its findings, "we give great deference to the particular expertise and informed judgment of the Board." *East Georgia Cogeneration*, 158 Vt. at 531, 614 A.2d at 803. Under this standard of review, we must accept the Board's findings on this issue. As the Board noted, only the broadest understanding of causation could attribute the immense dam construction projects planned by HQ to the relatively minute Vermont power purchase. The Board had to determine the point at which there was no "but for" relationship between the power purchase and the facilities construction. The line it drew is reasonable in light of the evidence before the Board, and we will not disturb it.

## IV.

The intervenors' third argument is related to their second argument because the relationship between the contract and

facilities construction is central to both. It involves the statutory requirement that the Board find that the purchase would "not adversely affect system stability and reliability." 30 V.S.A. § 248(b)(3). During the hearings, intervenors argued that for a number of reasons HQ was an unreliable source of supply. One of the reasons involved approvals from the National Energy Board of Canada (NEB) necessary for HQ to export power to Vermont.

On September 27, 1990, after the close of evidence in this case, NEB issued a license approving, among other HQ contracts, the contract at issue here. The approval was subject to certain conditions. Among them, Condition 10 provided that "any production facility required by [HQ] to supply the exports authorized" must be subjected, prior to construction, to environmental review under Canadian government regulations and procedures. Petitioners filed a copy of the decision with the Board and argued that it supports their position on the reliability of the contract. By letter, intervenors agreed that the Board should take judicial notice of the decision but disputed petitioners' interpretation of Condition 10. In intervenors' view, Condition 10 creates major conflict between the national and provincial governments that make it likely that the contract would be cancelled. They sought to present evidence interpreting the decision and conditions under Canadian law, as well as on the effect that an unfavorable environmental ruling on HQ's construction plans would have on the Vermont contract.

The Board addressed the NEB ruling in its decision. It declined to take evidence on Condition 10 of the NEB ruling and made a finding of reliability based on the exhibits and testimony already before it. Because it was concerned that HQ's interpretation of terms of the contract might have been changed by the NEB decision, the Board conditioned its approval on the presentation by petitioners of an affidavit of an HQ official affirming the three points that the Board considered critical to its finding of reliability. They were the following:

(A) power and energy supplied under the Contract are [HQ]'s *system* obligations, and that they are not dependent upon the scheduling, review, licensing, or actual construction of any specific generating facilities by [HQ];

(B) deficiencies in power or energy resulting from delay or cancellation of any specific generating facilities will be distributed equitably among all foreign and domestic purchasers from [HQ], and that *pro rata* distributions will be considered equitable unless good cause exists for considering other allocations to be more equitable; and

(C) that the damage and compensation provisions of the third paragraph of Article 1.4 of the Contract would be controlling if the [NEB] were, in the future, to declare that approvals required by the Contract were no longer valid under Condition 10 . . . .[7]

The Board ordered a hearing on the issue of Condition 10's effect on reliability of the contract if the affidavit was not filed within thirty days.

Petitioners filed an affidavit prepared by an official of HQ in a timely fashion. Intervenors claimed that the affidavit did not include all the elements required by the Board, and they again sought to present evidence on the issue of the reliability of the contract as affected by Condition 10. The Board, however, found that the affidavit met its requirements, and relied on evidence presented at the earlier hearings to reiterate its finding of reliability and consequent approval.

■■ On appeal, intervenors first attack the use of the affidavit because they had no opportunity to cross-examine the HQ official and present rebuttal evidence. At the time that the Board requested the affidavit, it had before it the NEB decision and intervenors' request to reopen the evidence to address the decision. It is within the Board's discretion whether to reopen the evidence. See *In re Green Mountain Power Corp.*, 138 Vt. 213, 216, 414 A.2d 1159, 1161 (1980). The Vermont Rules of Civil Procedure govern proceedings in the PSB absent a specific rule to the contrary on the particular issue involved. Vermont Public Service Board, Rule 2.103. The Board has not adopted a specific rule governing motions to reopen. Under the Vermont Rules of

---

[7] Article 1.4 of the contract with HQ provides for compensation to Vermont utilities by HQ for "all costs, damages and expenses incurred or suffered or to be incurred or suffered" in the event it is unable to deliver electricity under the contract because of regulatory action by a Quebec or Canadian governmental body terminating or modifying a permit or license.

Civil Procedure, such a motion is considered a motion for a partial new trial. See V.R.C.P. 59(a) (on motion, court may grant new trial "on all or part of the issues"). Such a motion is routinely decided on affidavits so that the court can determine whether new evidence is available that might lead to a different outcome on the issue involved. See V.R.C.P. 59(c) (time for serving affidavits). We see no reason why the Board cannot use a similar procedure.

Intervenors' challenge misperceives the use of the affidavit. The Board was concerned about whether the contractual provisions, and HQ's method of meeting them, created sufficient protection for Vermont utilities and ratepayers in light of the uncertainty caused by the NEB decision. The affidavit showed what the evidence would be on that issue if the Board reopened its taking of evidence. The Board was satisfied that the new evidence would not affect the decision it reached on the evidence received prior to the NEB ruling and therefore denied reopening. Contrary to intervenors' argument, the affidavit was not used as evidence on system stability and reliability, and was not part of the support for its conclusion that the contract met the requirements of § 248(b)(3). It was used solely to deny intervenors' motion to reopen. Although intervenors complained generally that they were denied the opportunity to offer evidence on the issue, they submitted no affidavit to show that their evidence would differ from that submitted by petitioners on the specific items of concern to the Board. We see no error in the use of the affidavit.

 Intervenors also attack the Board's reliability conclusion, arguing that if the affidavit is not considered, there is no evidence to support this conclusion. At the outset, we emphasize that the statute does not require a finding by the Board that a purchase be absolutely reliable, but rather only that it not have an adverse effect on the reliability of the system. 30 V.S.A. § 248(b)(3). In a § 248 proceeding, the Board "is engaged in a legislative, policy-making process." *Auclair v. Vermont Elec. Power Co.*, 133 Vt. 22, 26, 329 A.2d 641, 644 (1974). The Board is given the task of using its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment. See *In re East Georgia Cogeneration Limited Partnership*, 158 Vt. at 538, 614 A.2d at 807. In reach-

ing its conclusions, the Board relied on two main facts. First, the power and energy under the contract could be supplied without new HQ facilities, and the contract only extended in time the current level of power reliably being provided to Vermont utilities from HQ. Second, the contract itself provided for substantial compensation by HQ in the event it was unable to meet contract requirements because of termination or modification of licenses or permits. These facts adequately support the Board's conclusion that the contract would not have an adverse effect on system reliability.

## V.

Intervenors next argue that the Board erred in approving the contract on the basis of a showing by the petitioners of a statewide need for the purchased energy, without a showing of specific need for the allocation assigned to each utility.[8] In connection with its October 12, 1990 decision, the Board issued a certificate of public good with respect to the contract overall but only an interim certificate with respect to the interutility participation agreement. The intent was to make the certificate provisional subject to a utility-by-utility analysis of need in relation to the share of the energy each would receive under the contract. The utilities objected to this way of phrasing the order, and on January 7, 1991, the Board changed it to a conditional certificate of public good subject to conditions that required that the utility allocations be analyzed in a separate proceeding. Intervenors argue that the Board did not have the power to issue a conditional certificate.

We find no error in the Board issuing a certificate with conditions subsequent. Its action in this respect was similar to that which we approved in *In re Vermont Electric Power Co.*, 131 Vt.

---

[8] In its interim and conditional orders, the Board granted petitioners a certificate of public good for the HQ purchase as a whole, but required further filings, with an opportunity for intervenors to rebut, before approving the participation agreement with its specific allocations to each utility. The filings have since been made, and on February 12, 1992, the Board approved the allocations in the participation agreement. Petitioners claim that the Board's subsequent approval of the allocations renders the intervenors' argument moot. We find the argument not to be moot, as the Board's approval of the allocations itself is the subject of an appeal.

427, 435, 306 A.2d 687, 692 (1973), also an appeal from a § 248 proceeding. In that case, the Board authorized construction of a proposed transmission line, but certified only the general route of the line under the § 248 criteria. *Id.* at 434, 306 A.2d at 691. Because plans had not been prepared for the specific route and method of transmission, the Board retained jurisdiction to review the detailed plans under those criteria prior to construction. We upheld the Board, stating that such post-certification procedure is nowhere prohibited by the statute and is "an accepted practice of the Board and administrative tribunals generally." *Id.* at 435, 306 A.2d at 692. Our approval of a conditional certificate applies equally here. The Board determined that the energy supplied in the HQ contract was needed in the state; the only open question was the allocation among the participating utilities. There was no reason to delay the contract with HQ while the allocation was being determined. The Board's power to order reallocation or resale meant that there could be no prejudice to any ratepayer or to the intervenors.

We are not persuaded by intervenors' argument that the statute requires a utility-by-utility assessment against the criteria of § 248(b) so that no certificate, conditional or otherwise, can be issued based on a statewide evaluation. We see no such requirement in the language of the section. The adjudicatory burden of twenty-four separate proceedings, each exploring the complicated issues involved over many days of hearing, would be oppressive and could lead to inconsistent results. Consequently, the Board consolidated issues in a way that made the proceeding manageable while protecting fully the rights of the parties, as well as those of Vermont ratepayers. The Board's approach was reasonable.

## VI.

The next argument presented is that the Board's finding of economic benefit to the state from the HQ purchase was erroneous because it failed to account for economic implications of the contract other than the price and reliability. Before issuing a certificate of good, the Board must find that the contract "will result in an economic benefit to the state and its residents." 30 V.S.A. § 248(b)(4). Intervenors claim that the Board erred in failing to analyze separately the secondary effects on the state's

economy—for example, the loss of jobs and tax revenues—from continuing to import a large amount of hydroelectricity from Quebec.

As with other arguments made by intervenors, the weakness is in the factual foundation for their legal position. This argument is made primarily with respect to DSM investments. As discussed above, the Board found that the state would need the HQ contract as well as all feasible DSM. Although this conclusion was based in part on the costs of DSM, it was also based on the Board's judgment concerning the technological feasibility and consumer acceptability of DSM. The Board found no conflict between the HQ contract and DSM. Thus, the relative job creation and tax revenue consequences of these approaches to the state's energy issues became irrelevant because the approaches were not being compared.

Intervenors have framed the issue here as also involving other sources of supply—that is, they argue that the Board erred in failing to compare secondary costs with respect to other sources of supply. We can find nowhere that they raised this issue below. In their reply brief to the Board, they stated: "DSM is *the* alternative to the contract which we espouse." (Emphasis in original.) We need not consider the issue for the first time on appeal. See *In re New England Tel. & Tel. Co.*, 146 Vt. at 505, 505 A.2d at 682.

## VII.

Intervenors' final claim is that the Board erred in refusing to consider evidence that the human rights of the Cree would be violated by HQ's planned hydroelectric facility construction near James Bay. They argue that consideration of the rights of the Cree, a Native American people living in parts of northern and central Quebec, is required for a finding that a purchase will "promote the general good of the state" under 30 V.S.A. § 248(a). They further argue that the failure to consider the effect of the purchase on the Cree violates the Vermont Constitution.

In response to an offer of proof by intervenors, the Board concluded that § 248 requires it to look at the effects of a purchase of imported power on people and the environment

outside Vermont only insofar as they directly affect the State of Vermont or its people, environment or economy. The Board relied on the language of the statute that plainly limits its scope to "the general good *of the state*." 30 V.S.A. § 248(a)(1) (emphasis supplied). It also relied on the fact that the Legislature had considered bills that would have specifically adopted the position advanced by intervenors and had failed to enact them.[9]

We recognize, as did the Board, that there are reasons why the Legislature might choose to prohibit imports that result in a significant adverse impact on the life and culture of a native people. Such a prohibition would prevent us from exporting the environmental consequences of our energy decisions and recognize our responsibility as world citizens. There are strong contrary reasons: the energy is being supplied by a democratic country that should be left to make the hard choices in balancing the interests of minorities against the interests of all its citizens, and we are unable in any precise way to measure environmental consequences throughout the world or to know how to ameliorate them. Our duty, however, is to respect the balance of these reasons adopted by the Legislature, not to strike our own balance.

The construction adopted by the Board is supported by the plain meaning of the statute. See *Burlington Electric Dep't v. Vermont Dep't of Taxes*, 154 Vt. 332, 335–36, 576 A.2d 450, 452 (1990) ("[w]here the meaning of a statute is plain on its face," we apply it according to its terms). Absent compelling indication of error, we accept the construction of a statute by the administrative body responsible for its execution. *Id.* at 337, 576 A.2d at 453. There is no compelling indication that the Board's construction of § 248 is erroneous.

Intervenors also ground their claim on the Vermont Constitution, Chapter I, Article 9, which provides that the people are not "bound by any law but such as they have in like manner assented to, for their common good." Intervenors read into the term "common good" principles of morality and justice

---

[9] The Board's ruling on the meaning of § 248 came before its ultimate fact-finding that determined that the HQ contract would not cause construction of further facilities in James Bay.

that prevent approval of a contract that would destroy the culture and homeland of the Cree. We use a number of different approaches in construing the Vermont Constitution, among them, "historical analysis, examination of the text, constructions of identical or similar provisions in other state constitutions, and use of sociological materials." *State v. DeLaBruere*, 154 Vt. 237, 262–63, 577 A.2d 254, 268 (1990). None of these approaches support intervenors' position. There is nothing in the text to suggest that it was intended to prevent the Legislature or Board from approving commerce with another nation because of that nation's treatment of its citizens. Decisions construing the provisions of the United States Constitution and the constitutions of other states limit their reach to protection of people within the jurisdiction governed by the constitution. See, e.g., *Vancouver Women's Health Collective Society v. A.H. Robins Co.*, 820 F.2d 1359, 1363 (4th Cir. 1987) (rights guaranteed by federal constitution do not extend to nonresident aliens outside the United States); *De Ayala v. Florida Farm Bureau Casualty Insurance Co.*, 543 So. 2d 204, 206 (Fla. 1989) (rights under federal and Florida constitutions inapplicable to those outside jurisdictions of federal and state governments). None of the historical materials cited by intervenors demonstrate a different view.

Nor is the one case cited by intervenors, *Gross v. Gates*, 109 Vt. 156, 194 A. 465 (1937), helpful to them. In that case, the Court held that the Legislature's act of compensating the widow of a slain deputy sheriff was not an unconstitutional appropriation of funds for private use. *Id.* at 165, 194 A. at 470. Although the Court found that the Legislature's discharge of a "moral obligation" was permissible under Article 9,[10] there is no suggestion that the Legislature must protect every obligation the Court would find justified by morality and justice. *Gross* does not support the proposition that § 248 is unconstitutional because it does not command protection of the Cree.

---

[10] *Gross* relies on the taxing power in Article 9, not the "common good" language. To the extent *Gross* is grounded in the Constitution's recognition of moral obligations and justice, the Court relied on the common benefit clause of Article 7. Vt. Const. ch. I, art. 7 ("government is . . . instituted for the common benefit, protection, and security of the people, nation, or community").

Although we have grounded our decision on the statutory and constitutional provisions relied upon by intervenors, we emphasize that their argument is also answered by the Board's finding that the HQ contract will not cause new construction in James Bay. As discussed above, that finding is supported by the evidence. To the extent that dam construction in James Bay will destroy the homeland and culture of the Cree, Vermont utilities and electricity consumers are not the cause.

*Affirmed.*